NO. 07-07-0109-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

DECEMBER 29, 2009

_____

In the Interest of J.H.M.,

A Child

_____

FROM THE COUNTY COURT AT LAW NO. 1 OF LUBBOCK COUNTY;

NO. 2004-526,287; HON. LARRY B. LADD, PRESIDING
_____

***Memorandum Opinion***
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Stacy Hayes (Hayes) and Harold Short (Short), parents of J.H.M., appeal the order terminating their parental rights. Hayes contends, through twelve issues, that 1) she was denied due process, 2) the trial court erred in the admission and exclusion of evidence, 3) the trial court erred in failing to hold a hearing on her motion for new trial and by failing to grant same, 4) the trial court erred in failing to grant her motion for directed verdict and her motion for JNOV because the evidence was insufficient, 5) she was denied a fair and impartial trial due to jury misconduct, 6) the trial court erred by allowing a trial amendment

on the day of trial and again on the sixth day of trial; and by denying a motion for continuance based on surprise of same, 7) the trial court erred by dismissing veniremen for bias and economic hardship, 8) the trial court erred by allowing the guardian ad litem for J.H.M. to testify in violation of the Texas Family Code, and 9) it was an abuse of discretion to allow broad form submission to the jury.

Short contends that the trial court abused its discretion by 1) allowing a trial amendment after trial had started, 2) allowing the guardian ad litem to make recommendations in violation of the Texas Family Code, 3) by using broad form submission and 4) the evidence was insufficient to support termination of his parental rights. We affirm.

## *Background*

As evidenced in the record, Hayes had her first child, G.L., when she was seventeen. The pregnancy was a result of a sexual assault for which the perpetrator was convicted and sentenced to prison. Hayes is hearing impaired and requires hearing aids in both ears which according to her has been an obstacle at times in her life. In 1996, Hayes married Stewart Lujan (Lujan), who is also hearing impaired, and a second child was born to Hayes, L.L. This marriage was volatile and included periods of separation. It was during a period of separation that Hayes had a relationship with Short. This relationship began in late December 1998 and ended in either late February or early March of 1999. Hayes testified that she had become pregnant during this relationship and she advised Short of this situation. According to Short, he was told by Hayes that she was pregnant but that it was a tubal pregnancy and she would have to terminate the pregnancy. Shortly thereafter, Short moved to Austin and Hayes reconciled with Lujan. Subsequently,

2

in 2003, Short was convicted and sentenced to prison for burglary. He remained incarcerated at time of trial. J.H.M., the subject of this suit, was born on October 28, 1999. According to Short, he did not know about the birth at the time the child was born and later found out through Hayes after the petition to terminate her rights was filed. A subsequent paternity test proved that Short was the biological father of J.H.M.

At some point in 2000 or 2001, Hayes and Lujan became separated and Lujan moved to New Mexico. In 2001, Hayes began seeing another man by the name of Joe Gomez. This relationship too proved to be volatile and in March of 2001, Child Protective Services (CPS) stepped in to remove G.L., the oldest child, from Hayes' home. This removal came about after CPS had offered Hayes a place at a women's shelter to protect her and her children from abuse from Gomez. Hayes refused and remained with Gomez. Finally, they were evicted from the home where they had been living. Allegations were then made concerning abuse to G.L. and CPS opened a case on her. Upon arrival, CPS found J.H.M. and L.L. sick, having both vomit and diarrhea in the playpen. According to the parties, at this time, CPS agreed not to open a case on L.L. and J.H.M. if Hayes voluntarily agreed to place the children outside her home. G.L. was placed by CPS with Hayes' mother, Janice Short. Hayes agreed to place the other two girls with Methodist Childrens Home (Methodist). L.L. was three years old and J.H.M. was seventeen months old at the time. Upon receiving the girls, Methodist, then contacted the Schreibers about placing the girls with them. The Schreibers requested a week in order to get the house ready for the girls. For a week, L.L. and J.H.M. lived with Robin McGrew. McGrew testified that when she received the children, they were filthy and hungry. Furthermore, they both had bad cases of lice.

3

While under CPS' care, Hayes continued to see Gomez and once tested positive for cocaine and marijuana. Furthermore, she refused to work with CPS for a long period of time because she did not want to "get rid of Joe Gomez." However, in 2003, after she was no longer seeing Gomez, Hayes began dating Tom Sekander which ended when he moved to Dallas in 2004. During her relationship with Sekander, Hayes suffered eviction and sporadic employment. Around the time Sekander and Hayes split up in 2004, Hayes began emailing a man in Ireland by the name of John Hayes who became her present husband. They purchased webcams and spoke every day. He came to the United States in December of that year and bought a house for himself and Hayes. Earlier that year in June, L.L. and G.L. had been returned to Hayes. In September of 2005, the couple was married, and about a year later they had a child. In the summer of 2006 all three left to visit Ireland. Hayes had sent G.L. and L.L. to New Mexico for summer visitation with Lujan. While in Dallas, Hayes received a call from Lujan's girlfriend that he and she were fighting and that he had left her alone with the girls. The girlfriend asked that Hayes come and get the girls; however, Hayes refused since they had already purchased the tickets to Ireland. Hayes was also informed that the girls had to be taken to the doctor due to bad cases of lice and that G.L. had a vaginal infection. Hayes left on her trip to Ireland for two weeks.

J.H.M.'s placement continued with the Schreibers throughout this time period. They had been married for over twenty years and both had received college educations. Paul Schreiber (Paul) worked in the insurance business and Debbie Schreiber (Debbie) had worked as a dietician in the past but at time of trial was staying at home with J.H.M. They had no children of their own and had become interested in becoming foster parents through McGrew who they knew through their church. The Schreibers had contacted

4

Methodist where McGrew was a foster parent and completed the process and requirements set out to become foster parents. Prior to taking in J.H.M. and L.L, the Schreibers had provided care to other children. As testified to at trial, most foster care placements through Methodist last approximately three to six months.

When the Schreibers first received J.H.M. and L.L., the girls were filthy and "pitiful." They both had runny noses which later turned out to be severe infections resulting in both girls having tubes placed in their ears. J.H.M. had no shoes at the time of placement. The Scheibers stayed in constant contact with CPS who advised they would probably be "attaching" the girls to G.L.'s case due to Hayes refusal to cooperate with CPS. According to Paul, in 2003, Hayes advised him that she wanted the Schreibers to adopt the two girls if CPS were to open cases on them since the girls had lived with them for two years. Paul observed on visits that there was a bond between L.L. and Hayes but not so with J.H.M. Mostly J.H.M. was left to play by herself while attention was paid to L.L.

The Schreibers continued to receive reports that Hayes was not meeting her goals set by CPS and Methodist and they decided legal action needed to be taken to give the girls permanency and stability. During this period of time from 2001 to 2004, Hayes had moved several times due to her inability to pay rent and subsequent eviction. She was unable to hold a job for very long periods of time and received welfare. However, after Hayes married John and acquired a home, CPS and Methodist decided to return all the girls to her. Paul had spoken to L.L.'s father, Lujan, and was advised by him that he wanted to seek custody of L.L. Therefore, the Schreibers filed to be appointed managing conservators, for termination and adoption of J.H.M. in May of 2004. At that time the presumed father was Lujan, who voluntarily relinquished his rights to J.H.M.

5

During the pendency of the termination petition, Hayes contacted Short who was incarcerated. She wrote Short and advised him to contact the Schreibers, their attorney and the court advising that he was J.H.M.'s father and that he wanted to exercise his parental rights. Pleadings were amended to include termination of Short's rights. In January of 2007, a jury trial was held and the jury in an eleven to one decision terminated Hayes' and Short's parental rights to J.H.M. They both appeal that decision.

### Hayes Appeal

### Issue One - Due Process

In her first issue, Hayes contends that she was denied due process. This is so according to Hayes because 1) the Schreibers lacked standing, 2) the Schreibers' action of filing a petition for termination violated their contract with Methodist and was unconscionable, 3) the Schreibers lacked a justiciable interest and failed to overcome the parental presumption in favor of family reunification, and 4) use of the broad form submission was not feasible in this case. We overrule the issue.

*Standing*

The question of standing to bring an original suit affecting the parent-child relationship seeking managing conservatorship is a threshold issue. *See In re SSJ-J*, 153 S.W.3d 132, 134 (Tex. App.–San Antonio 2004, no pet.). This is because standing is implicit in the concept of subject matter jurisdiction. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Standing is a question of law and we review the issue de novo. *See In re SSJ-J*, 153 S.W.3d at 134. As with an order of dismissal for lack of subject matter jurisdiction, we review an order of dismissal for lack of

6

standing by construing the pleadings in favor of the plaintiff and must look to the pleader's intent. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d at 446. However, a court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

Foster parents now have a couple of avenues to the courthouse. Under §102.003 of the Family Code, they can bring an original suit affecting the parent-child relationship (SAPCR) if the child was placed with them by the "Department of Protective and Regulatory Services" and has lived with them "for at least [twelve] months ending not more than [ninety] days preceding the date of the filing of the petition." TEX. FAM. CODE ANN. §102.003(a)(12) (Vernon Supp. 2009). Under §102.005 of the same Code, foster parents who have not had possession of the child for at least twelve months, ninety days before they file suit may nevertheless have standing to request termination and adoption if they have "had actual possession and control of the child for not less than two months during the three month period preceding the filing of the petition." *Id.* §102.005(3). In the case at bar, the Schreibers filed a petition for termination which was joined with a petition for adoption. The record reflects that they had actual possession of J.H.M. for thirty-nine months prior to the filing of their petition for termination and adoption on June 2, 2004, prior to the entry of the July 16, 2004 temporary orders, which period meets the time requirement specified in the Family Code. *See id.*

Hayes, further, contends that the Schreibers, for purposes of §102.005(3), were only "contract employees of Methodist . . ." and that they were only given limited control over

7

the child. However, we do not find that the statute makes the distinction Hayes now argues. Nor does she cite us to any authority interpreting the statute in that manner. Rather, §102.003(a)(12) allows the Schreibers to file for termination of the parental relationship and the adoption of J.H.M. *In re H.G.*, 267 S.W.3d 120, 123 (Tex. App.–San Antonio 2008, no pet.) (holding that when standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis).

*Unconscionability*

Hayes next contends that the Schreibers' action of seeking to terminate the parent-child relationship contradicted their contract with Methodist. Thus, their conduct was unconscionable. This purportedly is so because the doctrine of quasi-estoppel prevents a party from asserting a right inconsistent with a position previously taken by him. Here, according to Hayes, she relied on the assurances of the Schreibers evidenced by her working to better her home situation for her children. However, Hayes failed to raise this defense in her pleadings; therefore, it was waived.[1] *In re J.M.*, 156 S.W.3d 696, 705 (Tex. App.–Dallas 2005, no pet.) (holding that estoppel is an affirmative defense that must be pled; if it is not, then it is waived).

Hayes next asks us to "carve out another appropriate exception to standing, disallowing standing where foster parents have unlawfully restrained a child from a parent or private foster placement agency, when the foster parents only have possession under the terms of a non-adoption placement agreement." However, Hayes failed to allege this alternate ground of estoppel in her pleadings. Nor did she request that the issue be

---

[1] In her reply brief, Hayes contends that she affirmatively pled *res judicata* which includes estoppel. These affirmative defenses are not the same and must be separately pled.

8

submitted to the jury; therefore, the matter was waived. *See Harris County Child Welfare Unit v. Caloudas*, 590 S.W.2d 596 (Tex. Civ. App.–Houston [1st Dist.] 1979, no writ) (holding that Harris County had failed to plead the theory that the foster parents had signed a contract specifically forbidding the adoption; therefore, the complaint was waived).

*Justiciable Interest and Parental Presumption*

Next, Hayes argues that the Schreibers lacked a justiciable interest and failed to overcome the parental presumption in favor of family reunification. According to Hayes, because her other two children were placed back with her, she enjoyed the strong parental presumption favoring reunification. However, the Schreibers had a justiciable interest granted them under §102.005 of the Texas Family Code.

J.H.M. had been with the Scheibers since she was seventeen months old in 2001. In 2004, over three years later, they were still raising the child when they sought termination of the parental relationship. Therefore, we find that they had a justiciable interest and, thus, standing to petition for termination. *See Rodarte v. Cox*, 828 S.W.2d 65 (Tex. App.–Tyler 1992, writ denied) (the section of the Family Code in existence at the time of suit gave the foster parents a justiciable interest in the subject matter of the suit).

Regarding the matter of the presumption favoring reunification, it is rebuttable. *Hall v. Harris County Child Welfare Unit,* 533 S.W.2d 121, 122-23 (Tex. Civ. App.–Houston [14th Dist.] 1976, no writ). And, the evidence of record clearly and convincing supports the jury's rejection of it here.

9

*Broad Form Submission*

Finally, Hayes contends that her due process rights were denied because extraordinary circumstances existed which prevented the broad form submission from being feasible. Such a submission, according to Hayes, allowed the Schreibers to "avoid their burden of proof, engage in burden shifting to the biological parents, and engage in trial by mud-slinging in order to try to get the jury to make a decision. . . ."

Controlling Texas case law specifically authorizes broad form submission in parental rights cases. *See Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g); *see also J.T.G.*, 121 S.W.3d 117, 128-29 (Tex. App.–Fort Worth 2003, no pet.) (applying *E.B.* to uphold jury findings on grounds for termination when multiple grounds for termination were sought and the trial court submitted the issue using a broad form question). Furthermore, it is well-settled law that a jury charge that tracks the statutory language and then asks the controlling question does not amount to an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d at 649. In parental termination cases, the controlling question is whether the relationship between the parent and each child should be terminated. *Id.* Here, we find that the charge as submitted tracked the statutory language, asked the controlling question, and assisted the jury in reaching the verdict.

### Issue Two - Admission of Evidence

In her second issue, Hayes contends the trial court erred in allowing Short to ask about information contained in documents from the Texas Department of Correctional Justice pertaining to himself. According to Hayes, the Schreibers attempted to introduce

records from prison concerning Short and incidents that occurred while he was incarcerated. The trial court excluded the documents themselves and, according to Hayes, ordered that "none of the records or the information in the records **in any way** should be brought before the jury." (Emphasis in original). We overrule the issue.

The decision whether to admit evidence rests within the discretion of the trial court. *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). A court abuses its discretion when it rules on the admissibility of evidence in an arbitrary or unreasonable manner or without reference to guiding legal principles or rules. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to do so. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Finally, to be entitled to reversal due to the erroneous admission of evidence, the appellant must not only show that the trial court erred in admitting the evidence but also that the error was reasonably calculated to cause and probably did cause the rendition of an improper verdict. *In re C.R.*, 263 S.W.3d 368, 370 (Tex. App.–Dallas 2008, no pet.).

In the case before us, Short was testifying in response to questions regarding conduct he had been cited for while in prison, specifically inappropriate sexual conduct. The trial court in a previous hearing had excluded any of the prison documents from evidence. It further ruled that if a need arose for impeachment at trial, then the parties could approach the bench and specifically identify to the court the record sought to be used. Otherwise, the records would remain inadmissible.

11

The line of questioning that Hayes now complains of related to when Short was eligible for parole and was denied it due to several bad conduct reports. However, the record before us shows that Short had answered several questions regarding the denial of his parole before an objection was lodged. This is problematic since the Texas Rules of Appellate Procedure state that "as a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion . . . ." TEX. R. APP. P. 33.1(a)(1). Furthermore, an objection is timely when made as soon as the ground for it becomes apparent. *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997). So, if a party fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is waived. *Id.* That was and is the situation here.

### *Issues Three, Four and Nine - Motion for New Trial and Jury Misconduct*

In her third and fourth issues, Hayes contends the trial court erred by failing to hold a hearing on her motion for new trial and by denying the motion. In her ninth issue, she contends that she should be granted a new trial due to jury misconduct. We overrule all three issues.

According to Hayes, jury misconduct occurred when one of the jurors had a conversation with Paul while the trial was going on. This same juror also had a conversation with the CASA representative. When the jury began deliberations, it was brought to the jury's attention that the juror who had a conversation with CASA had received information regarding the case. Furthermore, the juror attended the same church as the Schreibers and had contact with them at church. Because one of the allegations

12

in the motion for new trial pertained to jury misconduct, the trial court was required to hold a hearing, according to Hayes. Furthermore, according to Hayes, because no one filed controverting affidavits, the allegations regarding jury misconduct must be taken as true. Therefore, Hayes purportedly was entitled to a new trial since her motion had to be accepted as true, or at the very least, she was entitled to a hearing on it.

A new trial based on jury misconduct will be granted upon proof that: (1) misconduct occurred; (2) it was material misconduct; and (3) based on the record as a whole, the misconduct probably resulted in harm to the movant. *See* TEX. R. CIV. P. 327(a); *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000). Furthermore, we review the trial court's denial of a motion for new trial based on jury misconduct for an abuse of discretion. *Pharo v. Chambers County, Texas*, 922 S.W.2d 945, 948 (Tex. 1996).

In the case before us, an affidavit was attached to the motion for new trial. In the affidavit, which document was executed by a private investigator who had spoken with jurors after trial, it was represented that a juror had seen Paul and he spoke to her by saying it was okay for her to say "hi." The juror informed the rest of the jury about this conversation. As previously stated, the misconduct must be material misconduct; we do not deem the interchange at issue to rise to that level. Rule 226a of the Texas Rules of Civil Procedure permits "casual greetings" between the participants and the jurors. Saying "hi" falls into that category.

Next, the investigator's affidavit represented that, during deliberations, the same juror mentioned she had been in contact with CASA because she was supposed to begin training as a CASA volunteer. According to the record, the trial court addressed this matter

13

in a hearing and was told that the juror called CASA because she was to start training as a CASA volunteer and had advised them she would be unable to do so because of the present case. The trial court determined that no discussion was had regarding the details or evidence of the present case. Furthermore, the conversation occurred before the trial started.

In sum, we cannot say that the trial court abused its discretion in either failing to hold a hearing or grant the motion for a new trial.

### *Issues Five, Six and Seven - Directed Verdict/JNOV and Insufficient Evidence*

In her fifth, sixth and seventh issues, Hayes contends that the trial court erred by failing to grant her motion for directed verdict and her judgment notwithstanding the verdict because the evidence was insufficient to support termination.[2] We disagree and overrule the issues.

Hayes contends that the evidence is legally and factually insufficient to support termination. The jury charge contained the following grounds for termination: that Hayes 1) voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return; or 2) knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child; or 3) engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child; or 4)

---

[2]In reviewing rulings on motions for directed verdict and judgment notwithstanding the verdict, appellate courts apply the no-evidence standard. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005); *Byrd v. Delasancha*, 195 S.W.3d 834, 836 (Tex. App.–Dallas 2006, no pet.). We review the evidence and must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d at 827. Therefore, we include the review of the denial of the motions for directed verdict and JNOV in our review of legal sufficiency.

14

failed to support the child in accordance with her ability during a period of one year ending within six months of May 11, 2004, the date the termination was filed. The case was submitted to the jury in broad form and, thus, we need to only find the evidence sufficient to support a single ground for termination. *See In re Z.C.*, 280 S.W.3d 470, 478 n.29 (Tex. App.–Fort Worth 2009, pet. denied).

To terminate an individual's parental rights, Texas law requires by clear and convincing evidence that 1) the parent has engaged in one of the statutory grounds for termination and 2) the termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2009). Next, §161.001(1)(D) authorizes termination of parental rights of a parent who knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children.

Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.–Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.–Fort Worth 2000, pet. denied). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *See In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.–Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection

D.  *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.–Fort Worth 1995, no writ) (stating that "environment" refers not only to the acceptability of living conditions, but also to a parent's conduct in the home).  Furthermore, in determining endangerment of the child, courts may look to parental conduct occurring both before and after the child's birth.  *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.–San Antonio 2000, pet. denied).  Conduct that subjects a child to a life of uncertainty and instability also endangers the child's physical and emotional well-being.  *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.–San Antonio 1998, pet. denied) (using illegal drugs and violating parole provided sufficient evidence of endangerment).  To "endanger" the physical or emotional well-being of a child means "more than a threat of metaphysical injury or the possible effects of a less-than-ideal family environment."  *Tex. Dep't. of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).  However, it is not necessary that the conduct be directed at the child or that the child actually suffer injury, so long as the conduct exposes the child to loss or injury.  *Id.*  Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct.  *In re A.J.H.,* 205 S.W.3d 79, 81 (Tex. App.–Fort Worth 2006, no pet.).

Regarding the best interests of the child, the focus is on the child, not the parent.  *See In re R.F.,* 115 S.W.3d 804, 812 (Tex. App.–Dallas 2003, no pet.).  However, there is a strong presumption that it is in the child's best interest to preserve the parent-child relationship.  *Swate v. Swate*, 72 S.W.3d 763, 767 (Tex. App.–Waco 2002, pet denied).  In deciding whether to override this presumption, factors to be considered include:  the child's desires; the child's emotional and physical needs now and in the future; the emotional or physical danger to the child now and in the future; the parenting abilities of

16

the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1978) (the *Holley* factors). Also, permanence is of paramount importance in considering a child's present and future needs. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.–Dallas 1995, no pet.).

Finally, the applicable standards of review are explained in *In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002) and *In re C.H.*, 89 S.W.3d 17 (Tex. 2002). Through them, and when addressing a factual sufficiency complaint, we are told to determine whether, after assessing the entire record, the evidence permits a factfinder to reasonably form a firm belief or conviction about the truth of the State's allegations. *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. Unlike the situation wherein the legal sufficiency of the evidence is in question, our focus is not simply upon the undisputed evidence that supports the verdict, but the disputed evidence as well. *In re J.F.C.*, 96 S.W.3d at 266. Implicit in the standard is our obligation to accord the factfinder the deference needed for it to fulfill its role. *In re C.H.*, 89 S.W.3d at 25-26. Furthermore, if the evidence is factually sufficient, then, it is also legally sufficient. This is so because, logically, there cannot be "no evidence" of record if the record contains enough evidence to enable the factfinder to reasonably form a firm belief or conviction as to the existence of pivotal facts.

17

In the case at bar, J.H.M. , at seventeen months, was behind on her immunizations, was speech delayed, and had serious infections in her sinuses, throat and ears. She was seen by an ear, nose and throat specialist and was found to be in need of surgery. Hayes failed to attend this surgery even though she was aware of same. Furthermore, Hayes refused to leave or stop seeing Gomez who was abusive to her and to at least one of her children, G.L. During the time with CPS, Hayes tested positive for ingesting cocaine and marijuana. She also was evicted several times and refused to work with CPS or Methodist in order to reunify the family. She was unable to maintain gainful employment and was in trouble financially. According to the evidence, she also was exercising her visitations with J.H.M. while an active arrest warrant for issuance of a bad check pended against her. So too did the evidence show that she continued to associate with individuals who abused drugs and who were unable to maintain a stable lifestyle for her or her children. One of those individuals was Short, with whom she had an affair while married and who has been in prison twice. Additionally, the two girls who were sent home to live with Hayes were found to have lice, and one also began to suffer from an untreated vaginal infection with a foul smelling discharge.

Given the record, we conclude that the evidence, viewed in the light most favorable to the section 161.001(1)(D) finding, was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that Hayes knowingly placed or knowingly allowed J.H.M. to remain in conditions or surroundings which endangered the physical or emotional well-being of the child. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the § 161.001(1)(D) finding or was not so significant that the factfinder could not reasonably have

18

formed a firm belief or conviction that the elements of subsection D were shown. Accordingly, we hold that the evidence was legally and factually sufficient to support the section 161.001(1)(D) finding.

Concerning the matter of best interests, the record shows that 1) J.H.M. wanted to live with the Schreibers and her sister, L.L., 2) since being with the Schreibers, she began to excel in school and was reading one to two levels ahead of her grade while before she was speech delayed, 3) J.H.M. suffers from Perthes disease which is a degenerative disease that may result in surgery, 4) after visitations with Hayes, J.H.M. suffered from emotional breakdowns and fits of anger, 5) when visitations did not occur, J.H.M. had periods of calm and could focus better, 6) the Schreibers have lived in their present home for over ten years and have stable employment and income, 7) they have planned for the provision of J.H.M. in the future in the form of life insurance and college planning, 8) they attend counseling along with J.H.M., 9) J.H.M., at the time of trial, had lived with the Schreibers for approximately six years and 10) they have filed to adopt J.H.M. Again, viewed in the light most favorable to the best interests of the child finding, the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that Hayes' termination of her parental rights was in the best interests of the child. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the best interests finding or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction that it was in the best interests of the child that Hayes' rights be terminated.

### *Issue Eight - Exclusion of Hayes' Video Exhibits*

In her eighth issue, Hayes contends that the trial court erred by prohibiting her from playing various video tapes taken by her private investigator to the jury. The Scheibers objected to her playing them because of their cumulative nature. We overrule the issue.

The record reflects that the jury was shown several video tapes before the Scheibers lodged their objection. Despite the objection, the trial court nonetheless admitted all the tapes into evidence. Furthermore, Hayes admitted that the tapes not shown were of the same nature as those shown. So too was she allowed to continue showing tapes of instances that were different or unique from the others. Under these circumstances, we do not find that the trial court's decision was an abuse of discretion.

### *Issues Ten and Eleven - Trial Amendment/Failure to Grant a Continuance*

In her tenth and eleventh issues, Hayes contends that the trial court erred by allowing the Schreibers to amend their petition on the day of trial to include "Short as a party to conservatorship." She further complains that the trial court erred by denying her request for a continuance after it allowed the Schreibers to amend their petition. We disagree and overrule the issues.

Hayes attempts to raise issues as to the termination of Short's rights, but we find she does not have standing to do so; neither she nor her attorney represented Short. *See In re Z.J.,* 153 S.W.3d 535, 538 (Tex. App.–Amarillo 2004, no pet.). Because she lacked standing to complain of the trial amendment, her issue regarding the denial of her motion for continuance was not an abuse of discretion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986) (stating that the granting or denial of a motion for continuance is within the trial court's sound discretion).

20

### *Issue Twelve - Improper Disqualification of Jury Veniremen*

According to Hayes, three jurors were improperly excused for economic hardship and two others were improperly excused for bias or prejudice. This allegedly was error which resulted in her failing to receive a fair trial. We overrule the issue.

Hayes contends that juror Ronald Mitchell was struck for cause because he was a member of the Church of Jesus Christ of Latter Day Saints and he held a fundamental belief that family is forever. Apparently she sought an advantage from that belief and his other belief that children were not "property" to be passed back and forth. Nonetheless, the record also had evidence indicating that Mitchell was also troubled by Hayes' position.

Whether a juror is biased or prejudiced is a factual determination to be made by the court in the event the evidence is conflicting. *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 760 n.77 (Tex. 2006) (stating that if prejudice is not established as a matter of law, the trial court makes a factual determination as to whether the venire member should be disqualified); *see Swap Shop v. Fortune*, 365 S.W.2d 151 (Tex. 1963) (because trial judges are actually present during voir dire, they are "in a better position . . . to evaluate the juror's sincerity and their capacity for fairness and impartiality"). Therefore, trial courts exercise discretion in deciding whether to strike venire members for cause when bias or prejudice is not established as a matter of law, and there is error only if that discretion is abused. *See Malone v. Foster*, 977 S.W.2d 562, 564 (Tex. 1998). Because the record shows that Mitchell was conflicted in his beliefs as a potential juror on this case, we find that the trial court did not abuse its discretion in dismissing him for cause.

21

Regarding Hayes' contentions that the other four jurors were improperly dismissed because the reason given by the court did not fall within the parameters of chapter 62 of the Texas Government Code, we find the contention inadequately briefed. According to Hayes, because the trial court erred in improperly dismissing these jurors, she was denied the "randomness and jury impartiality" guaranteed her. However, Hayes does not explain the latter contention; therefore, we find it conclusory and waived. *Canton-Carter v. Baylor College of Medicine,* 271 S.W.3d 928, 931 (Tex. App.–Houston [14th Dist.] 2008, no pet.); *see City of Hawkins v. E.B. Germany and Sons,* 425 S.W.2d 23, 26 (Tex. Civ. App.–Tyler 1968, writ ref'd n.r.e.) (holding that it has been the established rule in this state that even though the challenge for cause was improperly sustained, no reversible error is presented unless appellant can show he was denied a trial by a fair and impartial jury). Hayes failed to carry her burden in showing how she was denied a fair and impartial jury, therefore the argument is waived.

### Short's Appeal

### Issue Four - Sufficiency of the Evidence

We address Short's fourth issue first. Through it, he contends that the evidence was insufficient to support termination. We disagree and overrule the issue.

Again, because the case was submitted in broad form, we need only find the evidence sufficient to support a single ground and that it was in the best interests of the child to terminate Short's parental rights.[3] Keeping in mind the standards of review

---

[3] Regarding the termination of Short's parental rights, it was argued that he 1) knew he was the father of the child but then voluntarily left the child alone or in the possession of another without providing adequate support and while remaining away for a period of at least six months, 2) knowingly engaging in criminal conduct that resulted in his conviction of an offense, confinement or imprisonment, and inability to care for the child for not less than two years from February 17, 2006, and 3) voluntarily, and with the knowledge of the

22

mentioned above, we address whether Short knowingly engaged in criminal conduct that resulted in his conviction, imprisonment, and inability to care for the child for not less than two years from February 17, 2006.

Subsection Q permits termination when the clear and convincing evidence shows that the parent "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." TEX. FAM. CODE ANN. §161.001(1)(Q) (Vernon 2008); *see In re A.V.,* 113 S.W.3d 355, 360-61 (Tex. 2003). That is, subsection Q permits termination if the evidence shows that, during the two-year period following the initiation of the termination proceedings, the parent will be confined or imprisoned and unable to care for the child. *See id.* at 360-61.

It must be remembered that establishing incarceration for the requisite period does not, by itself, justify termination pursuant to subsection Q. *In re B.M.R.,* 84 S.W.3d 814, 818 (Tex. App.–Houston [1st Dist.] 2002, no pet.); *In re Caballero,* 53 S.W.3d 391, 395 (Tex. App.–Amarillo 2001, pet. denied). The evidence must also show that the parent was unable to care for the child for two years from the date of the petition's filing. *In re B.M.R.,* 84 S.W.3d at 818. Thus, incarceration and an inability to care for the child must each be established by the evidence to support termination. *See In re H.R.M.,* No. 14-05-00281-CV, 2007 Tex. App. LEXIS 1878, 2007 WL 707553, at*1 (Tex. App.–Houston [14th Dist.] March 8, 2007, no pet.) (mem. op.); *see also In re B.M.R.,* 84 S.W.3d at 818.

---

pregnancy, a) abandoned the child's mother during her pregnancy which abandonment continued through the child's birth, b) failed to provide adequate support or medical care for the mother during the period of abandonment, and c) remained apart from the child or failed to support the child since the birth.

Turning to the record, we find evidence that the Schreibers filed their petition to terminate Short's rights on February 16, 2006. Thus, at the latest, the Schreibers had to show that Short would remain incarcerated on February 17, 2008. Short contends that the Schreibers did not do so. Short is mistaken. The Schreibers introduced evidence establishing that Short was convicted of the felony offense of burglary and was sentenced to six years imprisonment. The judgment of conviction indicates that Short began serving the six-year sentence in February of 2004, and, if served in full, the sentence precludes him from being free until February of 2010. Yet, Short believed that he was subject to parole and could have been released before February of 2008.

The Texas Supreme Court discussed the effect of evidence showing that an incarcerated parent would be considered for parole in *In re H.R.M.,* 209 S.W.3d 105 (Tex. 2006). There it said that the "[m]ere introduction of parole-related evidence . . . does not prevent a factfinder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years." *Id.* at 109. It also stated that "[p]arole decisions are inherently speculative, and while all inmates doubtless hope for early release and can take positive steps to improve their odds, the decision rests entirely within the parole board's discretion." *Id.* The *H.R.M.* court also observed that the jury was free to disregard the father's testimony regarding parole. *Id.* So, the jury at bar was entitled to disregard Short's testimony regarding parole. *See id.* This seems especially so since he had been considered and denied parole in the past due to his misconduct.

Short next contends that the Schreibers failed to offer sufficient evidence to show he was unable to care for J.H.M. This was so because he believed that "his mother would

24

be ready, willing, and able to care for the child" especially since she is already taking care of another child of his through another relationship. Yet, the financial, physical, and emotional means available to his mother went undeveloped. Simply because she is caring for one of his children while he serves his prison sentence does not *ipso facto* mean that she can care for all of them. That his mother did not proffer testimony supporting his belief is also of import for we cannot merely assume that he speaks for her. In fact, the record reflected that his relationship with his mother was estranged and that he had very little, if any, contact with her. *See In re Caballero*, 53 S.W.3d at 396 (refusing to place burden on TDPRS to disprove existence of anyone with whom parent's child could be placed during his incarceration because adopting such rule would place an unreasonable burden on agency and judicial resources).

Additionally, since learning that he was J.H.M.'s biological father, Short has made no attempt to assist the child financially or to contact her either directly or through a family member. Nor does any evidence show that he arranged for someone to care for the child while he has been incarcerated. *See In re H.R.M.*, 209 S.W.3d 105 (noting significance of father's inability to testify that he had arranged for someone to care for the child during his incarceration in conducting a factual sufficiency analysis in a subsection Q case).

Given the record, we conclude that the evidence, viewed in the light most favorable to the section 161.001(1)(Q) finding, was sufficiently clear and convincing to enable a reasonable factfinder to form a firm belief or conviction that Short knowingly engaged in criminal conduct that has resulted in his (i) conviction of an offense and (ii) confinement or imprisonment and an inability to care for the child for not less than two years from the date

of the filing of the petition. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the §161.001(1)(Q) finding or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction that the elements of subsection Q were shown. Accordingly, we hold that the evidence was legally and factually sufficient to support the section 161.001(1)(Q) finding. We overrule Short's fourth issue.

### Issue One - Trial Amendment

We next address the allegation that the trial court erred in allowing the Schreibers to add a new ground for termination after trial had started. However, having found the evidence sufficient to support termination on a different ground than that alleged in the trial amendment, we find that error, if any, was harmless and we overrule the issue. *In re A.R.R.,* 61 S.W.3d 691, 698 (Tex. App.–Fort Worth 2001, pet. denied) (holding that as long as the court finds that at least one of the multiple grounds for termination was supported by the evidence and that termination was in the best interest of the child, the court may uphold the trial court's judgment even if there was not sufficient evidence to support termination on the other alleged grounds).

### Issue Two - Guardian Ad Litem's Testimony

Next, we address whether it was error for the trial court to allow the ad litem to testify about his recommendations when he never interviewed Short. We overrule the issue.

Section 107.002 of the Texas Family Code specifies that the powers and duties of a guardian ad litem for a child include, within a reasonable time after the appointment the obligation to "interview . . . the parties to the suit." TEX. FAM. CODE ANN. §107.002(b)(1)

26

(Vernon 2008). In the case before us, the ad litem testified that she had spoken to Hayes and her husband, John, to J.H.M., and to the Schreibers; however, she did not interview Short. This was so, according to the ad litem, because he was in prison and was not known of until late in the suit. Furthermore, he had not been involved in any aspect of J.H.M.'s life.

In our reading of the statute, we do not find that the guardian ad litem will not be allowed to testify if they do not follow all of the requirements as set out in the statute. Furthermore, we find that this would go more to the weight of the evidence and not its admissibility. Therefore, we do not find that the trial court abused its discretion in allowing the ad litem to give her opinion regarding the best interests of J.H.M.

### Issue Three - Broad Form Submission

In his third issue, Short complains about the use of the broad form submission in this case. We overrule it for the same reasons underlying our decision to overrule the identical contention asserted by Hayes.

Having overruled all of the issues, we affirm the judgment of the trial court.


Brian Quinn
Chief Justice

27